No. 7469.

The State vs. Succession of the Marquise de Circé.

An American has the legal and political right to abdicate his citizenship, and to become the citizen or subject of any other country.

The *status* of the husband *quoad* citizenship fixes that of the wife.   An American woman, marrying a foreigner, becomes a foreigner.   Her political *status* is changed *ipso facto* by her marriage with a foreigner.

A treaty of France with the United States provides that citizens of either country, upon whom a succession shall devolve, shall not be required to pay a greater tax or impost than the citizens of the country in which the succession was opened.   Under this treaty, property in Louisiana belonging to a Frenchman and devolving at his death upon his widow, resident of France, was not liable to the tax of ten per centum imposed by the State upon property bequeathed to foreigners.

Appeal from the Second District Court of New Orleans.   Tissot, J.

The Assistant Attorney-General for the State.   *Semmes, Denis* and *Chiapella* for Defendant.

Manning, C. J.   Louis Frederick Foucher and Felicie Burthe were born, reared, and married in this State.   He was born 1798, and his father, Pierre, was born in this city in 1755, and the latter's father, Antoine, who was Marquis de Circé, was born in France.   She was born in 1807, and her father, Dominque Burthe, was a native of France.   They were married in 1826, and resided here until 1836. They then removed to France, and there lived, never returning here even on a visit.   He inherited there the title of Marquis, bought a chateau, removed a part of his property to that country, and died at Paris in 1869, having exercised there for many years the rights of an elector.   His widow was his testamentary universal legatee,

State *vs.* Succession of Circé.

and she died in 1877. Both were buried in the family tomb in France.

The State sues to recover ten per centum of the property, situated within her borders, which was bequeathed by the Marquis de Circé to his wife in 1869. Of course, the law then in force must control the case. It is an Act of 1855 (Sess. Acts, p. 398) relative to successions, the seventh section of which reads : — "Each and every person, not being domiciled in this State, and not being a citizen of any State or Territory in the Union, who shall be entitled, whether as heir, legatee, or donee, to the whole or any part of the succession of a person deceased, whether such person shall have died in this State or elsewhere, shall pay a tax of ten per cent on all sums on the value of all property which he may have actually received from said succession, or so much thereof as is situated in this State, after deducting all debts due by said succession; when the inheritance, donation, or legacy consists of specific property, and the same has not been sold, the appraisement thereof in the inventory shall be considered as the value thereof."

The demand of the State is resisted on two grounds : — 1. The unconstitutionalilty of the law, in that it embraces more than one object, and this particular object is not expressed in its title, the argument being that the imposition of this tax is a matter of revenue, and was so treated in the parent acts from 1828 down to 1850, four in number, in all of which it was legislated upon as a matter of revenue, and was never treated otherwise until it was included in the Act of 1855, relating solely to successions. 2. That the testator was a subject of France at the time of his death, and had been for many years, and so was his wife, and his property in Louisiana, devised to her, was not subject to this tax because of the provisions of the treaty between France and the United States made in 1853.

Were the Marquis de Circé and his wife subjects of France in 1869, and if yea, does the treaty protect the property, devised by the one to the other, from this tax?

The assumption of his title shews of itself a renunciation of his American citizenship, so far as his voluntary act could renounce it. The inscription of his name on the electoral list of the arrondissement, wherein he lived, shews his active exercise of the privilege of voting in France. His continuous absence from Louisiana for a

third of a century is cumulative proof that his permanent domicile was changed at the moment of his leaving the State. He evidently went to stay. Had he the right to change his citizenship, and how does the law permit the change to be made?

We are the last people that can claim, either in political or legal tribunals, that a man once an American, is always an American. We went to war with Great Britain on that question in the early part of the century, and expended some blood in maintaining and more breath in hallooing for "sailor's rights," who thereafter were permitted to serve in our navy, notwithstanding their British birth. Later we have had temporary complications with Germany in protecting its former subject, who had become one of our citizens, and vindicating his right to throw off his allegiance to his natal government. Mr. Louis Foucher had the legal and political right to abdicate his American citizenship, and transform himself into Marquis de Circé, and subject of the Emperor of the French.

The law of France held Foucher to be her citizen, even while here. *Tout enfant nè d'un Francais, en pays étranger, est Francais.* Code Napoleon, Art. 10. And even if he had lost his quality of Frenchman by remaining here, or in any other way, he could recover it without naturalization by simply re-entering France with the declaration that he meant to remain. *Le Francais qui aura perdu sa qualité de Francais, pourra toujours la recouvre en rentrant en France avec l'autorization de l'empereur, et en déclarant qu'il veut s'y fixer, et qu'il renonce a toute distinction contraire à la loi Francaise.* *Ib.,* Art. 18. He was rehabilitated therefore as a French subject, many years before his death.

The status of the husband *quoad* citizenship fixes that of the wife. It is so by express law in France. *L'étrangére qui aura épousé un Francais, suivra la condition de son mari.* Code Napoleon, Art. 12. *Une femme Francaise qui épousera un étranger, suivra la condition de son mari. Ibid.,* Art. 19. The U. S. Congress extended the protection of a citizen to women who married Americans, by an Act of 1855, and in some of the cases of women claiming pay for destruction of property during the late war, it was held, where the property belonged to a wife in Louisiana, a native thereof who by its laws remained owner notwithstanding marriage, and her husband was a British subject, resident with her in this State, that she was deemed

to be a British subject also, and her rights were to be determined accordingly.

The Marquis de Circé was therefore a Frenchman, and if the treaty of 1853 covered the property acquired by her under the testament of her husband, her succession is not.liable for the tax.

The seventh article of that treaty exempts the citizens of each country from paying any greater tax or impost upon successions devolving to them, than citizens of the country in which the succession was opened. In Dufour's case the tax was claimed, he and his heirs being subjects of France, and the court held that the treaty barred the recovery. 10 Annual, 391. In a later case, this article of the treaty was also considered, and its applicability to heirs, subjects and residents of France, who inherit property in this State, was fully recognized as applying to successions opened after the date of the treaty. Suc. Prevost, 12 Annual, 577.

A paragraph in the opinion of the Supreme Court of the United States in Prevost *v.* Gremaux, 19 How. 1, seems to have produced the impression that the treaty did not supersede our State law, and that its effect was limited. The opinion reads thus:

" It is proper to say that the obligation of the treaty, and its operation in the State, after it was made, depend upon the laws of Louisiana. The treaty does not claim for the United States the right of controlling the succession of real or personal property in a State; and its operation is expressly limited to the States of the Union whose laws permit it, so long and to the same extent as those laws shall remain in force. And as there is no act of the Legislature of Louisiana repealing this law and accepting the provisions of the treaty, so as to secure to her citizens similar rights in France, this court might feel some difficulty in saying that it was repealed by this treaty, if theState court had not so expounded its own laws, and held that Louisiana was one of the States in which the proposed arrangements of the treaty were to be carried into effect."

This is not an *obiter*. On the contrary, it is an intimation of the most direct kind that courts ever give, that the United States Supreme Court did not think the treaty applied to successions in Louisiana, and only held that it did, because the State court had so held. Hence, the effort of the Assistant Attorney-General to obtain from us a reversal of the ruling in the Dufour and Prevost cases.

State *vs.* Succession of Circé.

The Dufour case was decided in 1855, and the Prevost in 1857, and in interpreting the article of the treaty and its effect on our law imposing the tax, we should, in a case of doubt, more readily follow a decision of this court, rendered so long as twenty-four years ago, than an intimation of the national court that the decision should have been the contrary.

But it is contended that the Legislature has unmistakably shewn that the treaty was not to have effect on successions in this State. The treaty was made in 1853. The Legislature in 1855, with this treaty before it, enacted that foreigners should pay this tax on property in this State, inherited by them.

The Act of 1855 was not passed with reference to the treaty. It was a part of that general revisory legislation, which has been had periodically in this State, the main effect of which is to make the ascertainment of the statute law difficult. It was simply a reproduction of the laws of previous years, which had existed long anterior to the date of the treaty. It was not a new enactment, but an old enactment put in a new place, and we do not think the tax imposed by it can be enforced where the French treaty of 1853 applies.

It will thus be seen we are relieved of the need of considering the first point raised by the defendant.

*Judgment affirmed.*

Dissenting opinion.

SPENCER, J. I am unable to concur in the opinions or decree of the majority of the court in this case.

I agree that Mr. and Mrs. Foucher were citizens of France. But I cannot agree that the legacy is exempt from the tax or imposition of ten per cent prescribed by the Act of 1855.

That exemption is claimed on two grounds: 1st. Because said act is unconstitutional, in that its title does not disclose its contents, and that it relates to more than one subject. 2d. That said act is in conflict with the seventh article of the treaty of 1853, between the United States and France.

That article reads as follows: "In all the States of the Union. whose laws permit it, so long and to the same extent as the said laws shall remain in force, Frenchmen shall enjoy the right of possessing personal and real property by the same title and in the same way as the citizens of the United States."

State *vs.* Succession of Circé.

The majority of the court have rested their decisions upon this second objection or defence, and have not passed upon the first, but as I differ with the court both as to the opinion and the decree, I must state briefly my conclusions as to that first point also.

The title of the act is, "An Act Relative to Successions."

We have uniformly held that those provisions of the existing Constitution, as well as those of the same nature in previous Constitutions, must receive a liberal interpretation, and that it was only in cases when the subject was clearly neither incidental nor germane to the title, that we could hold the act unconstitutional. I find nothing in the act, which is foreign to the matter of "successions."

The sections under which this "tax" is claimed, is clearly a disposition governing the distribution of estates falling to foreign heirs. The fact that the word "tax" is used instead of some other to express the dominant idea that the State is to have ten per cent of such estates, is without significance. Courts look at things, at intention, at effect, and not at words alone.

In 8 Howard, p. 494, the Supreme Court of the United States discussing this very act, treats it as a law "regulating the manner and terms upon which property, real and personal within the State, may be transmitted by last will and testament or by inheritance," to foreign heirs.

I see no reason, therefore, to hold the act unconstitutional.

2d. I confess my inability to see how, or where, that act conflicts with the treaty above mentioned. Of course, if it does, it is void. By the very terms of that treaty, it was to have effect only, in such of the States, as by their laws permit Frenchmen to possess and inherit on an equal footing with their own citizens, and it was to be in force in such States only "so long as their said laws shall remain in force."

The Supreme Court of the United States in "Prevost *v.* Gremaux," 19 Howard, p.——, through Chief Justice Tancy, discussing this very question, says: "The treaty does not claim for the United States the right of controlling the succession of real or personal property in a State. And its operation is expressly limited to the States in the Union whose laws permit it, so long and to the same extent as those laws shall remain in force. And as there is no act of the Legislature of Louisiana, repealing this law and accepting the provisions of the treaty, so as to secure her citizens similar rights

27

in France, this court might feel some difficulty in saying that it was repealed by this treaty if the State court had not so expounded its own law and held that Louisiana was one of the States in which the proposed arrangement was to be carried into effect.''

At the very time the decisions of our State courts, referred to by Judge Taney, and relied upon by my associates, were rendered, there stood unrepealed upon our statute books this very law, declaring, without exception, that the State should have ten per cent of all successions falling to foreign heirs. By what process of reasoning our predecessors reached the extraordinary conclusion that that statute was in conflict with, and therefore repealed by, that treaty, I am utterly at a loss to conceive. It is to my mind a manifest error.

But it is said the doctrine of *stare decisis* commands us to adhere to that error. I think that would be pressing the doctrine too far. The proper occasion for its application is in cases where a line of decisions has become a rule of property and the basis of title. That is not the case here. This is a money demand between the original parties or their heirs. I apprehend that a much longer line of decisions than is here presented would be ineffective to establish that the maker of a promissory note is not liable for its payment, in the face of a positive law saying they shall be liable.

I think the State should have judgment for the per centum claimed.

WHITE, J., concurs with Justice SPENCER.